IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TAMIKA JOHNSON,<br><br>              Plaintiff,<br><br>    v.<br><br>CITY OF PHLADELPHIA, et al.,<br><br>              Defendants. | CIVIL ACTION<br>NO. 18-4665 |

## OPINION

**Slomsky, J.**                                                     **July 31, 2019**

## I.  INTRODUCTION

This tragic case arises from the death of three individuals.  The decedents are Alita Johnson ("Alita"), Haashim Johnson ("Haashim"), and Horace McCoullem ("Horace") (collectively, "Decedents").  Plaintiff Tamika Johnson ("Plaintiff") is the administratrix of their estates.[1]  On March 20, 2018, a fire ignited on the second floor of a residential building that contained several apartments.  Alita, Haashim, and Horace lived in one apartment on the third floor.  Minutes after the fire began, Alita called 911.

When a citizen calls 911 to report a fire or request emergency services, the 911 operator that answers the call usually transfers it to a Philadelphia Fire Department Operator ("PFD Operator").  The PFD Operator then coordinates with a Philadelphia Fire Department dispatcher ("PFD Dispatcher") to send firefighters and Emergency Medical Services ("EMS") personnel to the scene, if necessary.

---

[1]  Haashim is Alita's three-year-old son.  (Doc. No. 1 ¶ 3.)  Horace is Alita's father and Plaintiff's stepfather.  (Id. ¶ 4.)

As expected, when Alita called 911, she spoke to a 911 operator. She told the 911 operator that there was a fire at her home, gave her the address, and mentioned that she was on the third floor of the building. Following the procedure described above, the 911 operator transferred her call to a PFD Operator. When the call was transferred, the 911 Operator conveyed to the PFD Operator an incorrect address for Alita. As a result, the PFD Operator conveyed the incorrect address to the PFD Dispatcher, who dispatched firefighters to the wrong location. When she dispatched the firefighters, the PFD Dispatcher told them that she received "reports" concerning an area on the third floor. Regarding the "reports," it is unclear what information she reported to the firefighters.

After her first 911 call ended, Alita called 911 again and was transferred directly to the PFD Operator. She repeated that a fire had ignited in her building and confirmed that she was waiting for help in an area on the third floor. In response, the PFD Operator instructed her to seclude herself, Horace and Haashim in a room on the third floor, with the door closed and the window open until firefighters arrived to rescue them. Realizing at this point that she originally communicated the incorrect address, the PFD Operator then relayed Alita's correct address to the PFD Dispatcher, who rerouted the firefighters to Alita's building. When the PFD Dispatcher communicated the correct address to the firefighters, she did not reiterate the "report" she received about the third floor.

Firefighters arrived at the building with no knowledge that Alita, Horace and Haashim were waiting to be rescued on the third floor. After extinguishing the fire on the second and third floors, they left the premises. Alita, Horace, and Haashim remained secluded in a room on the third floor of the building, where they died from smoke inhalation. City of Philadelphia ("City") officials discovered their bodies three days later.

Plaintiff sued the City of Philadelphia, the Philadelphia Fire Department,[2] Adam Thiel, Philadelphia Fire Department Operator Jane Doe, and Philadelphia Fire Department Dispatcher Jane Doe (collectively, "Defendants").  She seeks damages for the following claims:

- Violation of Civil Rights Under Fourteenth Amendment for a State-Created Danger against the PFD Operator (Count I);

- Violation of Civil Rights Under Fourteenth Amendment for a State-Created Danger against the PFD Dispatcher (Count II);

- Violation of Civil Rights Under Fourteenth Amendment Based on Monell Liability against the City of Philadelphia (Count III);

- Violation of Civil Rights Under Fourteenth Amendment Based on a Special Relationship against Jane Doe (PFD) Operator and the City of Philadelphia (Count IV);

- Violation of Civil Rights and Equal Protection Under the Law against Philadelphia Fire Commissioner Adam Thiel (Count V);

- Survival Actions against the City of Philadelphia (Count VI); and

- Wrongful Death (Count VII) against the City of Philadelphia.

(Doc. No. 1.)

Before the Court is Defendants' Motion to Dismiss the Complaint in its entirety.  (Doc. No. 9.)  Plaintiff filed a Response in Opposition (Doc. No. 10) and Defendants filed a Reply (Doc.

---

[2]   The Complaint does not allege any claims against Defendant Philadelphia Fire Department. (See Doc. No. 1.)  At a hearing on the Motions (Doc. Nos. 9, 10, 11, 12) held on May 8, 2019, Defendant correctly argued that the Philadelphia Fire Department is not a legal entity that can be sued as a matter of law.  Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 377 (E.D. Pa. 1995).  The correct defendant would be the City of Philadelphia, which is named as a defendant in this case.  Plaintiff conceded this point. (Hrg. Tr. at 23:19-25.)  Therefore, the Philadelphia Fire Department will be dismissed as a defendant in this case.

No. 11.)  Plaintiff then filed a Sur-Reply (Doc. No. 12).  For reasons discussed <u>infra</u>, Defendants'
Motion to Dismiss will be granted in part and denied in part.

## II.    FACTUAL BACKGROUND

The building that caught fire was a single-family, three-story row home in Philadelphia,
Pennsylvania.  (Doc. No. 1 ¶ 128.)  Although the property was not zoned or licensed as a multi-
family dwelling or boarding house, the owners of the building illegally rented each floor to one or
more families, with each tenant family occupying a separate floor.  (<u>Id.</u> ¶ 129.)  When it caught
fire, the building did not contain functioning smoke detectors or adequate fire escapes.  (<u>Id.</u> ¶ 131.)
As noted above, Decedents lived together in a unit on third floor.  (<u>Id.</u> ¶ 5.)

### A.  The First 911 Call

On March 20, 2018, around 11:30 p.m., a fire ignited inside of a second-floor unit of the
building.  (<u>Id.</u> ¶ 26.)  Its cause is unknown.  At 11:38 p.m., Alita called 911 to report the fire.  (<u>Id.</u>
¶ 27.)   The first person she spoke to was a 911 Operator.  After stating that she was calling to
report a fire, she told the 911 Operator her address.  (<u>Id.</u>)  Following the protocol described above,
the 911 Operator transferred her call to the PFD Operator.  While transferring the call, the 911
Operator did not convey to the PFD Operator the correct address that Alita gave her.  (<u>Id.</u> ¶ 29.)
She relayed the incorrect street number.  (<u>Id.</u>)  The PFD Operator provided this erroneous address
to the PFD Dispatcher, who sent firefighters to the wrong location.  (<u>Id.</u> ¶ 30.)  When the PFD
Dispatcher sent firefighters to the incorrect address, she told them that she was getting "reports"
concerning the third-floor rear of the burning building.  (<u>Id.</u> ¶ 31.)

Importantly, the allegations in the Complaint do not explain what "reports" the PFD
Dispatcher received from the PFD Operator that were subsequently conveyed to firefighters.
Although Alita told the 911 Operator that she was on the third floor of the burning building with

two other people, (id. ¶ 25), it is unclear if this information was conveyed to the PFD Operator and then to the PFD Dispatcher when her call was transferred.  (Id. ¶ 31.)

### B.  The Second 911 Call

Alita's first 911 call dropped.  At 11:40 p.m., she called 911 a second time and was transferred from the 911 Operator that answered her second call directly to the PFD Operator.  (Id. ¶ 32.)  Alita repeated that she was calling about a fire emergency in her building.  (Id. ¶ 33.)  In response, the PFD Operator instructed Alita to go to a room in the back of the building, shut the door, open the window, and place a towel at the bottom of the door.  (Id. ¶ 34.)  The PFD Operator assured Alita that rescuers would arrive shortly.  (Id.)  The PFD Operator then relayed the correct address of the burning building to the PFD Dispatcher, who rerouted the firefighters.  (Id. ¶ 35.) When the PFD Operator told the PFD Dispatcher the correct address, she did not state that she instructed three individuals to wait for help in a room on the third floor.  When the PFD Dispatcher rerouted the firefighters, she did not repeat to them that she had received reports concerning the third floor of the building.  (Id.)

At 11:42 p.m., during the same call, Alita confirmed to the PFD Operator that she followed the earlier instructions and closed herself inside a room on third floor with Horace and Haashim. (Id. ¶ 36.)  She specifically confirmed that they were on the third floor "all the way in the back" of the house.  (Id. ¶ 37.)  Alita remained on the phone with the PFD Operator while multiple firefighter units, who were equipped with ladder trucks, arrived at the residence between 11:42 p.m. and 11:44 p.m.  (Id. ¶ 38.)  Because they relied on the PFD Operator's assurances that

firefighters were coming to rescue them, Decedents did not attempt to escape the burning building in other ways available to them.[3]  (Id. ¶ 40.)

The PFD Operator stayed on the phone with Alita until 11:48 p.m., when the second 911 call disconnected.  (Id. ¶ 44.)  Throughout the call, the PFD Operator constantly assured Alita that firefighters were on their way.  (Id. ¶ 41.)

## C. Firefighters Arrival

When firefighters arrived at the building, they reached the property's second floor through the interior stairs and second-floor windows.  (Id. ¶ 42.)  They extinguished the fire on the second floor and then searched for survivors there.  (Id. ¶ 43.)  After ensuring that the second floor was clear of inhabitants, they moved to the third floor by using the interior stairs and third-floor windows.  (Id. ¶¶ 45, 46.)

Around 12:00 a.m., the interior steps between the second and third floor collapsed.  (Id. ¶ 48.)  At this point, there were four firefighters on the third floor who needed to be rescued from the building by other firefighters.  (Id. ¶ 49.)  At 12:04 a.m., firefighters placed exterior ladders at the front and rear windows of the third floor to rescue the firefighters that remained inside.  (Id. ¶ 50.)

At 12:14 a.m., firefighters on the third floor reported that the fire had been "knocked down," meaning it was completely extinguished.  (Id. ¶ 53.)  All firefighters then withdrew from the building.  (Id. ¶ 54.)  They did not know that Alita, Horace and Haashim were still on the third

_____

[3]  Alita, Horace and Haashim could have escaped through a window that was assessible to them during the fire.  The window opened onto a flat, walkable roof on the second floor, which remained intact throughout the fire.  (Id.)  Instead of climbing out of the window onto the walkable roof, Alita followed the PFD Operator's instructions and remained in the room.

floor expecting to be rescued. At 12:19 a.m., firefighters reported to the PFD that the fire at this location was under control. (Id. ¶ 56.) The PFD considered this to be the end of the emergency.

Three days later, PFD personnel discovered the unburned bodies of Decedents on the third floor. (Id. ¶ 59.) Each Decedent's cause of death was smoke inhalation. (Id. ¶ 60.) Therefore, they did not die from actual physical contact with the fire, but rather from excessive exposure to smoke while waiting for the firefighters. (Id. ¶ 61.)

After Decedents' bodies were discovered, Defendant Adam Thiel, the City's Fire Commissioner ("Commissioner" or "Thiel") told the surviving family members that firefighters had been unable to access the third-floor unit of the building during the fire, and therefore could not have saved the Decedents from their fatal exposure to smoke. (Id. ¶¶ 9, 62.) Because some firefighters had accessed the third floor during the fire to save other firefighters that remained inside of the building, Plaintiff alleges in the Complaint that Commissioner's Thiel's statement to Decedents' family members was false.

### D. The Building

As stated previously, the Decedents were tenants of the single-family, three-story house that caught fire. (Id. ¶ 128.) The property was owned by Granite Hill Properties, LLC ("Granite Hill") and its principal officer, Tyrone Duren ("Duren"). (Id. ¶ 127.) Also noted above, the property was being illegally rented as a boarding house and did not contain functioning smoke detectors or fire escapes. (Id. ¶¶ 129, 131.)

In 2014, the City's Department of Licenses and Inspections ("L&I") sued Granite Hill and Duren for its illegal operation of the property. (Id. ¶ 130.) After the lawsuit was filed, Duren and Granite Hill agreed to vacate the property, and turned it over to the City. (Id. ¶¶ 131, 132.) While the property was in the City's control, the City did not barricade or lock the building to prevent

people from entering.  (Id. ¶ 136.)  Despite the fact that Granite Hill and Duren agreed to released

control of the property to the City, it continued to rent it to tenants illegally.  (Id. ¶ 138.)

It is unclear how they regained control of the property.[4]

## III.    STANDARD OF REVIEW

"When ruling on a Rule 12(b)(6) motion, the court must accept the facts pled in the

complaint as true and construe them in the light most favorable to the plaintiff."  Adams v. U.S.

Airways Group, Inc., 978 F. Supp. 2d 485, 489 (E.D. Pa. 2013) (citing Semerenko v. Cendant

Corp., 223 F.3d 165, 173 (3d Cir. 2000)).  "The court may dismiss a complaint or claim only if it

is clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations."  Id.  "[T]he defendant has the burden of showing no claim has been stated."  Kehr

Packages v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).  "[T]he facts alleged must be taken

as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff

can prove those facts or will ultimately prevail on the merits."  Phillips v. County of Allegheny,

515 F.3d 224, 231 (3d Cir. 2008).  The Rules of Civil Procedure "do [] not impose a probability

requirement at the pleading stage, but instead simply call [] for enough facts to raise a reasonable

expectation that discovery will reveal evidence of" the elements necessary to sustain the plaintiff's

claims.  Id. (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b) for failure to

state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, has been made

clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

[4]    The Complaint does not set forth facts to explain when, how, or why Granite Hill and Duren
regained control of the building after they agreed to release it to the City during the lawsuit in
state court.  (See Doc. No. 1.)  It appears, however, that at the time of the fire, Decedents were
illegally renting the property from Duren and Granite Hill and that the City did not know that
the property was occupied.

statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quoting Iqbal, 556 U.S. at 678).  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Iqbal, 556 U.S. at 678).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

## IV.  ANALYSIS

In Counts I through IV of the Complaint, Plaintiff sets forth four claims that each stem from an alleged violation of the Decedents' substantive due process rights under the Fourteenth Amendment of the United States Constitution.  These claims invoke different theories of liability pursuant to 42 U.S.C. § 1983, which as discussed infra, provides a remedy for a federal civil rights violation committed by a person acting under the color of state law.

In Count V, Plaintiff claims that the City of Philadelphia violated Decedents' rights to equal protection under the Fourteenth Amendment of the United States Constitution. And in Counts VI and VII, Plaintiff brings two state law claims against the City of Philadelphia. The Court will now address each claim.

### A. Section 1983 Claims (Counts I through IV)

42 U.S.C. § 1983 ("Section 1983") provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. This statute does not create substantive rights, but instead provides a remedy for violations of rights established elsewhere. City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985). In order to state a claim under Section 1983, a plaintiff must allege that a person acting under the color of state law caused a deprivation of a right secured by the Constitution. Parratt v. Taylor, 451 U.S. 527, 535 (1981); Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.1995).

In Counts I, II, III, and IV, Plaintiff specifically averred that the Commonwealth, acting through Defendants City of Philadelphia, the PFD Operator and the PFD Dispatcher, violated the Decedents' "substantive due process rights" under the Due Process Clause of the Fourteenth Amendment. (Doc. No. 1.)[5] The Due Process Clause of the Fourteenth Amendment provides that

---

[5] Counts I through IV invoke different theories of liability. In Counts I (against the PFD Operator), II (against the PFD Dispatcher), and IV (against the PFD Operator and the City of Philadelphia), Plaintiff asserted claims under the two exceptions to the general rule created in DeShaney v. Winnebago County Department of Social Services, discussed infra, that the Due Process Clause imposes no duty on a state to provide members of the general public with adequate protective services. 489 U.S. 189 (1989).

"[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 2.

The initial point of reference for analyzing Plaintiff's Section 1983 claims is DeShaney v. Winnebago County Department of Social Services, where the United States Supreme Court reviewed Section 1983 claims under the Due Process Clause of the Fourteenth Amendment, and established a general rule that the Due Process Clause imposes no duty on a state to provide members of the general public with adequate protective services. DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195 (1989). This Court will first explain the Supreme Court's reasoning in DeShaney, and then two exceptions to its holding that inform Plaintiff's Section 1983 claims.

### 1. The Supreme Court's Holding in DeShaney

DeShaney involved a four-year old child, Joshua DeShaney, who was beaten so severely by his father that he suffered permanent and profound retardation. DeShaney, 489 U.S. at 193. Authorities in the Winnebago County Department of Social Services ("Winnebago") were aware that Joshua was being abused by his father. Id. at 192. At one point, they temporarily removed Joshua from the custody of his father after Joshua was admitted to a hospital with multiple bruises and abrasions. Id. When Joshua was returned to his home, his continued abuse was reported by a Winnebago caseworker who did nothing to intervene. Id. at 192-93. Eventually, Joshua's father finally beat him so badly that he suffered permanent injury. Id.

Joshua and his mother sued Winnebago under Section 1983, alleging that it violated Joshua's substantive due process right to liberty by failing to intervene. Id. at 193. The Supreme

---

In Count III (against the City of Philadelphia), Plaintiff brings a claim under Monell v. Dep't of Soc. Serv. of City of New York, also discussed infra, which is another avenue for liability under 42 U.S.C. § 1983. 436 U.S. 658 694 (1978).

Court held that the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services does not amount to a violation of the individual's due process rights. It explained:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text . . . [T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression. Its purpose was to protect the people from the State, not to ensure that the State protected them from each other.

Id. at 195-96.

This holding has two exceptions: (1) the state-created danger exception and (2) the special relationship exception. First, a state may be liable under the "state-created danger exception" when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003). Stated another way, this exception to the DeShaney rule applies when "the state, through its affirmative conduct, creates or enhances a danger for the individual." Brown v. Pennsylvania Dep't of Health Emergency Medical Servs. Training. Inst., 318 F.3d 473, 478 (3d Cir. 2003). Second, under the "special relationship" exception, the state may be liable to an individual for violating his or her constitutional rights when it takes a person into its custody and holds him there against his or her will. See, e.g., Youngberg v. Romeo, 457 U.S. 307 (1982) (finding that the state has a duty to ensure the safety of involuntarily-committed mental patients); Estelle v. Gamble, 429 U.S. 97 (1976) (holding that the state has a duty to provide medical care to inmates).

## 2. State-Created Danger Exception

Counts I and II of the Complaint each allege a claim under the state-created danger exception. The four elements of a claim under the state-created danger exception are:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actors acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions . . . ; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Kneipp v. Tedder, 95 F.3d 1199, 1201 (3d Cir. 1996) (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d. Cir. 1995)); see also Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (inserting the word "affirmatively" into the fourth element to clarify that liability under the state-created danger theory is based on "the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger") (citations omitted).

Importantly, all four elements of the four-part test must be satisfied for a plaintiff to establish a viable state-created danger claim. Failure to prove one element bars recovery. Brown v. Commonwealth of Pennsylvania, Dep't of Health Emergency Medical Services, 318 F.3d 473, 481 (3d Cir. 2002) ("We need to consider only one of the Kneipp elements to understand why appellants' state-created danger claim fails").

### a. The PFD Operator (Count I)

Plaintiff believes that Jane Doe Operator violated Decedents' constitutional rights in the following ways:

> 67. In this case, acting under color of State law, the PFD's [Philadelphia Fire Department's] Jane Doe [the PFD] Operator violated the decedents' substantive due process rights by a combination of directing them to close themselves inside the burning building's 3rd floor rear room, assuring them that Firefighters were

13

coming to their rescue, but then failing inexplicably to inform the Firefighters of the decedents' existence, location, or need of rescue.

68. The Jane Doe [PFD] Operator's failure to inform the Firefighters of the decedents' existence, location, and need of rescue had directly and foreseeably enhanced the decedents' risks of dying from the fire.

69. Had the Jane Doe [PFD] Operator executed her duty to inform the Firefighters of the information provided by Alita, the Firefighters inside the building's 3rd floor could have rescued the decedents before the Firefighters themselves safely exited the building.

70. Had Jane Doe [PFD] Operator executed her duty to inform the Firefighters that the decedents were waiting on the 3rd floor to be rescued, the Firefighters would not have erroneously concluded that there was nobody to rescue on that floor.

71. Had the Jane Doe [PFD] Operator not instructed the decedents to close themselves inside the 3rd floor's rear room, and not induced the decedents to rely on her repeated assurances that rescuers were on their way, the decedents could have saved themselves by attempting other options for escaping the fire – e.g. via another rear window that opened onto a flat, walkable roof.

72. The Jane Doe [PFD] Operator's failure to inform the Firefighters that the decedents were awaiting the Firefighters' emergency assistance manifests a willful disregard for the decedents' wellbeing.

73. The Jane Doe [PFD] Operator's willful disregard for the decedents' livelihood is evidenced by the fact that even after the Firefighters controlled the fire and completely vacated the premises, the Operator never informed anyone that the decedents had been on the 3rd floor waiting to be rescued. That is to say, the Jane Doe [PFD] Operator showed a complete indifference to the eventual plight of the people who frantically pleaded with the Operator for emergency assistance.

. . .

75. The Jane Doe Operator's [PFD's] affirmative instructions to remain inside the 3rd floor's rear room to await rescuers whom the Operator never told of the decedents' existence or location, placed the decedents at a greater risk of death than would have existed had the Jane Doe [PFD] Operator not instructed the decedents to remain in place and await the uninformed rescuers.

(Doc. No. 1 ¶¶ 67-73; 75.) In essence, Plaintiff proffers that the PFD Operator is liable under the

state-created danger exception because she enhanced the danger to Decedents by instructing them

to seclude themselves in a room on the third floor without informing firefighters of their location, existence and need of rescue.

Considering the four parts of the above test, Plaintiff's argument fails under the second prong, which requires her to prove that the PFD Operator "acted with a degree of culpability that shocks the conscience." Kneipp, 95 F.3d at 1201. This is a very high standard that requires state action to be "ill-conceived or malicious." Schieber v. City of Philadelphia, 320 F.3d at 419 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (resolving a split among circuits regarding the level of culpability required to violate due process)).

County of Sacramento v. Lewis is instructive. 523 U.S. 833. In Lewis, the parents of a motorcycle passenger killed in a high-speed police chase brought a Section 1983 claim alleging a deprivation of the passenger's substantive due process rights under the Fourteenth Amendment. Id. at 833-37. With respect to Section 1983 claims, the Supreme Court emphasized that the "touchstone of Due Process is protection of the individual against arbitrary government action." Id. at 845 (citing Wolff v. McDonnell, 418 U.S. 539, 558 (1972)). It further noted that only the most egregious official conduct is considered arbitrary in the constitutional sense. Id. With that framework, it explained the conscious-shocking standard as follows:

> The conscience-shocking concept points clearly away from liability, or clearly toward it, only at the ends of the tort law's culpability spectrum: Liability for negligently inflicted harm is categorically beneath the constitutional due process threshold, while conduct deliberately intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level. Whether that level is reached when culpability falls between negligence and intentional conduct is a matter for closer calls.

Id. Thus, the conduct and degree of culpability required to meet the conscious-shocking standard differs depending on the context and circumstances that confront state actors. To explain how the standard applies differently, the Court interpreted conscious-shocking behavior through the lens

of deliberate indifference, and stating "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional portions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Id. at 850.

Importantly, with regard to emergency circumstances, which is involved in the present case, "[a] much higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks." Id. at 852. In such a situation, conscious-shocking liability attaches when a "purpose to cause harm" is demonstrated. Id. at 853. Considering the facts of Lewis, the Court explained:

> [T]he police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders.

Id. (internal citations omitted). To contrast the urgency of a high-speed police chase, the Court compared the dire nature of the situation to the circumstances surrounding prison officials quelling an inmate riot. Id. (citing Whitely v. Albers, 475 U.S. 312, 320 (1986)). It explained:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.
>
> Nor does any substantial countervailing interest excuse the State from making provision for the decent care and protection of those it locks up; "the State's

responsibility to attend to the medical needs of prisoners [or detainees] does not ordinarily clash with other equally important governmental responsibilities."

Id. at 851-52 (internal citations omitted).  Applying the deliberate indifference standard, the Court reasoned:

> [L]iability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.  But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed."

Id. at 853-54 (citations omitted).

The Third Circuit, when analyzing Section 1983 claims, has been guided by the Supreme Court's analysis, supra, to set the standard for determining conscious-shocking liability.  See e.g., Miller v. City of Philadelphia, 174 F.3d 368, 370 (3d Cir. 1999) (holding that a social worker who separated a parent from her a child should be held to a standard of gross negligence as opposed to "purpose to cause harm" because the social worker was not required to make split-second decisions); Ziccardi v. City of Philadelphia, 288 F.3d 57, 58 (3d Cir. 2002) (applying the "shocks the conscience" test to medical paramedics who responded to an emergency, and required proof that defendant paramedics consciously disregarded, not just a substantial risk, but a great risk that serious harm would result, because medical emergencies invoke a heightened standard).

Turning to the instant matter, Plaintiff failed to establish that the PFD Operator acted with the required degree of culpability to establish conscious-shocking behavior under second element of the state-created danger test: whether the state actors acted with a degree of culpability that shocks the conscience.  Because this case involves a fire emergency where state actors were required to act swiftly under pressure, Plaintiff must prove a heightened level of fault to establish

such conscious-shocking behavior. Similar to the police officers in <u>Lewis</u>, the PFD Operator was in a situation that required her to make decisions in haste under pressure, without the benefit of real time to reflect. Thus, the Court will apply the standard articulated in <u>Lewis</u> to the facts of this case. It follows that the PFD Operator's actions would be conscious-shocking if she was deliberately indifferent to Decedents' danger. Under the guidance of <u>Lewis</u>, conscious-shocking liability would attach only if the PFD Operator's actions demonstrated a purpose to cause harm.

Plaintiff specifically argues that the conscious-shocking element of the state-created danger exception is satisfied because:

> It is bewildering that [Jane Doe Operator] would direct the Decedents to close themselves inside a room of the burning building to await rescue from Firefighters, but then never inform the responding Firefighters of the Decedents' existence. Even after the Firefighters controlled the fire and vacated the 3rd floor because they mistakenly believed there was nobody to rescue on that unit, the Operator still never informed anyone that the Decedents had been awaiting rescue on the 3rd floor. Not until three days after the fire, and only after the Decedents' family had repeatedly called the PFD in search of their relatives, were the Decedents' intact and unburned bodies discovered by the PFD inside the bathroom of the 3rd floor's front room. Under these circumstances, a jury could reasonably find that Operator's complete indifference to the plight of the people who frantically pleaded with her for emergency assistance is sufficient to "shock one's conscience."

(Doc. No. 10 at 14.) At the core of Plaintiff's argument is an assumption that the PFD Operator purposely directed Decedents to wait in a closed room while she withheld information about their need of rescue from firefighters. The facts, however, do not support such an assumption. Rather, the record depicts the PFD Operator's attempt to help the Decedent victims in good faith and does not suggest that she acted with a purpose to cause harm.

For instance, after learning that Alita was calling in regard to a fire emergency, the PFD Operator promptly followed protocol and transferred her call to the PFD Dispatcher. In addition, after advising Alita to stay in a room in the back of the building, and shut the door (Doc. No. 1 ¶

34) the PFD Operator remained on the phone with Alita for eight minutes, from 11:40 p.m. to 11:48 p.m., giving her instructions on what to do until rescuers arrived. (Id. ¶¶ 32, 34, 36, 39, 44.) Her instructions, which were to shut the door, open the window, place a towel at the bottom of the door, and "stay calm," appear to account for the dangers she perceived Decedents were facing during the fire emergency. (Id. ¶ 34.) The PFD Operator also assured Alita that rescuers would arrive shortly. (Id.) Plaintiff does not allege any facts to suggest that these assurances were made with knowledge to the contrary. Overall, the facts suggest that the PFD Operator acted under the impression that firefighters knew about the need to rescue Alita, Horace, and Haashim.

Because the record does not suggest that the PFD Operator acted with purpose to harm, as is required to meet the stringent standard that courts have assigned to the conscious disregard element, Plaintiff has not demonstrated a viable state-created danger claim against the PFD Operator. Count I of the Complaint will be dismissed.

### b. The PFD Dispatcher (Count II)

Plaintiff next argues in Count II that the PFD Dispatcher, acting under the color of state law, similarly created a danger to Decedents by failing to inform the firefighters of their existence, location and need of rescue, which increased their risk of dying from the fire. (Doc. No. 1 ¶ 80.)

This claim fails for two reasons. First, similar to the state-created danger claim against the PFD Operator in Count I, Plaintiff has not established liability under the second prong of the state-created danger test. The Court will analyze whether the PFD Dispatcher's actions were conscious-shocking under the same standard applied to the PFD Operator, supra. Thus, to establish the PFD Dispatcher's liability under the conscious-shocking standard, Plaintiff must show that the PFD Dispatcher was deliberately indifferent to the Decedents' lives and acted with a purpose to cause harm.

Here, Plaintiff contends the PFD Dispatcher's actions shock the conscience because:

It is mind-boggling that the [PFD] Dispatcher would dispatch Firefighters to the burning building but never inform them of the Decedents' existence, known location, or need of rescue. Even after the Firefighters controlled the fire and vacated the 3rd floor because they mistakenly believed there was nobody inside to rescue, the [PFD] Dispatcher still never informed anyone that the Decedents had been awaiting rescue on that unit. Not until three days after the fire, and only after the Decedents' family had repeatedly called the PFD in search of their relatives, were the Decedents' intact and unburned bodies discovered by the PFD inside the bathroom of the 3rd floor's front room. Under these circumstances, a jury could reasonably find that the [PFD] Dispatcher's complete indifference to the plight of the people whom she knew had been awaiting rescue from Firefighters she had dispatched to the scene is sufficient to "shock one's conscience."

(Doc. No. 10-2 at 17.)  This contention is unpersuasive.

Notably, the PFD Dispatcher played a limited role in the emergency. When she received information about the fire emergency, she dispatched firefighters to the address she received and conveyed that she received reports from the third floor. (Doc. No. 1 ¶ 31.) After learning that that she dispatched firefighters to the incorrect address, she rerouted them to the correct address. (Id. ¶ 35.)

Plaintiff avers that the PFD Dispatcher's actions were "conscious-shocking" because she released firefighters to the emergency scene without telling them explicitly that Decedents were awaiting their help on the third floor. Further, she argues that after the firefighters controlled the fire and left the premises, the PFD Dispatcher never told firefighters that Decedents were still inside the building.

Similar to Plaintiff's argument in Count I above, her reasoning relies on the supposition that the PFD Dispatcher deliberately withheld information about Decedents when communicating with firefighters. Plaintiff further adopts the notion that the PFD Dispatcher deliberately refrained from telling firefighters that Decedents were waiting in the building when firefighters left the building. These assumptions are unsupported. The facts alleged do not even suggest that the PFD

Dispatcher acted with a purpose to cause harm. Thus, Plaintiff did not establish that the PFD Dispatcher acted in a conscious-shocking manner, and her state-created danger claim in Count II fails under this prong.

Second, Plaintiff's state-created danger claim against the PFD Dispatcher also fails under the fourth prong of the state-created danger test. Liability under this prong depends on whether "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Kneipp, 95 F.3d at 1201.

In Bright v. Westmoreland, the Third Circuit broke this element down into the following three parts: (1) a state actor exercised his or her authority; (2) the state actor took an affirmative action; and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. Bright v. Westmoreland, 443 F.3d 281, 282 (3d. Cir. 2006).

Importantly, regarding the fourth element, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1374 (3d Cir. 1992); Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990) (finding that DeShaney holds "that a state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim"). Thus, a state actor's misuse of state authority, rather than a failure to use it, violates the Due Process Clause. In Bright, the Third Circuit clarified this point by stating:

> While we have acknowledged that the line between action and inaction may not always be clear, we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised.

Bright, 443 F.3d at 282 (internal citations omitted).  Accordingly, Plaintiff must show that the PFD Operator took an affirmative action that put Decedents in a more vulnerable position than they would have been in if she never acted at all.

Significantly, only affirmative action sufficiently establishes liability under this prong. Here, the PFD Dispatcher acted affirmatively on the following three occasions: (1) dispatched firefighters to the incorrect address (Doc. No. 1 ¶ 31); (2) stated that she received "reports" from the third floor (id.); and (3) rerouted firefighters to the correct address (Id. ¶ 35).

Plaintiff argues that her actions satisfy the fourth element of the state-created danger test because:

> [The PFD Dispatcher's] failure to notify the Firefighters of the information in her possession had placed the Decedents at a greater risk of death than would have existed had the Decedents never sought emergency assistance from the PFD [Philadelphia Fire Department].

(Doc. No. 10-2 at 18.)

Plaintiff attempts to satisfy this element by pointing to the PFD Dispatcher's failure to take an affirmative action.  She does not explain how any of the PFD Dispatcher's three affirmative actions, listed above, enhanced the danger to Decedents.  The Third Circuit has made clear that a state actor's failure to take affirmative action to protect a victim is insufficient to support a Due Process violation.   Therefore, Plaintiff's state-created danger claim against the PFD Dispatcher also fails under the fourth prong of the four-part test.

Because Plaintiff has not demonstrated a viable state-created danger claim against the PFD Dispatcher under the second and fourth prongs of the four-part test, Count II of the Complaint will be dismissed.

### 3. Special Relationship Exception (Count IV)

Next, in Count IV of the Complaint, Plaintiff alleged that the PFD Operator and the City of Philadelphia violated Decedents' substantive due process rights under the special relationship exception to the DeShaney rule. (Doc. No. 1 ¶¶ 105-114.) She specifically proffers that "[t]he City's instructions to seek emergency rescue services from the City's PFD, coupled with Jane Doe [the PFD] Operator's instructions to essentially barricade inside the 3rd floor's rear room, effectively curtailed the decedents' freedom to act and thus created a 'special relationship' between the City and decedents." (Id. ¶ 112.) Tellingly, in both her Opposition to the Motion to Dismiss (Doc. No. 10) and her Sur-Reply to Defendant's Reply to Plaintiff's Opposition (Doc. No. 12), Plaintiff has not responded to or opposed Defendant's argument for dismissal of Count IV.

As explained above, the special relationship exception is applicable when the state takes a person into its custody and holds him or her against his or her will, or where the state, by its affirmative exercise of power, restrains an individual's liberty such that it renders him unable to care for himself. DeShaney, 489 U.S. at 199-200 (holding that a special relationship did not exist between plaintiff and the State because the conduct did not occur while plaintiff was in the state's custody). Focusing on physical restraint, the DeShaney court explained:

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . .

DeShaney, 489 U.S. at 200.

The Supreme Court has made clear that for the "special relationship" exception to apply, the state must affirmatively act to physically curtail the individual's freedom, such that he or she can no longer care for him or herself. See Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982) (the Constitution imposed a duty upon the state to provide involuntarily committed mental patients

"such services as are necessary to ensure their 'reasonable safety' from themselves and others");
see also Estelle v. Gamble, 429 U.S. 97 (1976) (holding that the state had an affirmative duty to provide adequate medical care for prisoners since incarceration prevents an inmate from caring for himself).

Here, the state did not exercise custody over the Decedents in a physical sense, such that they were no longer capable of caring for themselves. Specifically, the City and the PFD Operator did not physically restrain them from acting at their own will. Thus, the special relationship exception does not apply and Count IV will be dismissed.

### 4. **Monell Claim (Count III)**

Count III of the Complaint asserts a claim under Monell v. Dep't of Soc. Serv. of City of New York, also pursuant to 42 U.S.C. § 1983. 436 U.S. 658 694 (1978). Under Monell, a municipality like Philadelphia is not responsible for the random acts of its employees based on respondeat superior,[6] but a municipality may be liable when an official policy, custom, or deliberate indifference to the rights of its citizens, causes an injury to a plaintiff.

To bring a Monell claim, a plaintiff must establish (1) that a constitutionally-protected right has been violated, and (2) the alleged violation resulted from municipal policy or custom, or the deliberate indifference to the rights of citizens. Id. at 694-95; see also Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).

The Supreme Court has made clear that a "proper analysis requires [the court] to separate two different issues when a Section 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is

---

[6]   Under the theory of respondeat superior, a party is held liable for the acts of its agents.

responsible for that violation." <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 120 (1992) (citation omitted).

In the present case, Plaintiff has attempted to establish a constitutional violation against the City of Philadelphia in Count IV, under the special relationship exception to the <u>DeShaney</u> rule, discussed <u>supra</u>. (<u>See</u> Doc. No. 1 ¶¶ 105-114.) Because the Court has concluded that Plaintiff has not established a constitutional violation against the employees of the City of Philadelphia involved in this case, it follows <u>a fortiari</u> that no constitutional violation was caused by the City itself because no custom, policy or indifference has been shown to exist here. Therefore, Plaintiff's <u>Monell</u> claim against the City of Philadelphia fails and Count III also will be dismissed.

Consequently, for all the reasons set forth above, Defendant's Motion to Dismiss will be granted on Counts I, II, III, and IV of the Complaint.

**B. Equal Protection Claim (Count V)**

In Count V of the Complaint, Plaintiff asserted that Commissioner Adam Thiel violated Decedents' constitutional right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.[7] Specifically, she alleged that in order to prevent her from seeking legal redress for Decedents' preventable deaths, Commissioner Thiel misrepresented that firefighters were unable to rescue Decedents from the third floor of the burning building.

---

[7] The Equal Protection Clause of the Fourteenth Amendment provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> U.S. Const. amend. XIV

To properly allege a violation of the Equal Protection Clause under Section 1983, a plaintiff must aver that he or she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Goldhaber v. Higgins, 576 F.2d 694, 722 (W.D. Pa. 2007) (citing Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). To prevail on an equal protection claim, one must show intentional and purposeful discrimination. Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985). An equal protection claim must allege facts to show that plaintiffs received treatment different from that received by other similarly-situated persons. Brown v. Borough of Mahaffey, 35 F.3d 846, 850 (3d Cir. 1994).

Here, after Decedents' bodies were discovered, Commissioner Thiel informed their relatives, including Plaintiff, that firefighters could not access the third floor during the fire, and therefore could not have rescued decedents from this floor. Because at least four firefighters were on the third floor during the fire, Commissioner Thiel's statement, as alleged in the Complaint, was false. (Doc. No. 1 ¶¶ 117-121.)

Plaintiff contends that the Commissioner deliberately misrepresented the PFD's ability to rescue the decedents in order to deter her from seeking legal redress for Decedents' preventable deaths, and to thereby deny them their right to equal protection under the law. (Doc. No. 9-1 at 11; Doc. No. 10-2 at 22.)

Accordingly, to sustain an equal protection claim, Plaintiff must show Commissioner Thiel treated Decedents unequally as compared to similarly-situated fire victims. Put another way, Plaintiff must show that Commissioner Thiel did not misrepresent facts to other fire victims who had viable legal claims against the City of Philadelphia arising from the PFD's deficient emergency services.

Plaintiff has not set forth in her Complaint any facts to support this theory of liability. In fact, she acknowledged that she has not alleged such facts with specificity and requests leave of court to file an amended Complaint to allege additional supporting facts on this claim.

In regard to amending a Complaint, Federal Rule of Civil Procedure 15(a)(2) provides:

> [A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(2). Amendments to a complaint pursuant to Rule 15 are "liberally granted" and "rest within the sound discretion of the trial court." Massarsky v. Gen. Motors Corp., 706 F.2d 111, 125 (3d Cir.1983). Furthermore, it is clearly established that Rule 15(a) should be liberally construed in favor of allowing disputes to be settled on their merits. See United States v. Hougham, 364 U.S. 310, 316 (1960) (citing Conley v. Gibson, 355 U.S. 41, 48 (1957)); Kauffman v. Moss, 420 F.2d 1270, 1276 (3d Cir. 1970).

As such, the Court will exercise its broad discretion to liberally interpret Rule 15(a) and allow Plaintiff to amend her Complaint to set forth additional facts to support her equal protection claim. In this regard, Plaintiff should amend the Complaint only if she can allege additional facts to overcome the deficiencies described in this section of the Opinion. Accordingly, the Court will deny Defendant's Motion to Dismiss with respect to Count V, and grant Plaintiff leave to amend her Complaint on this claim.

### C. State Law Claims For Wrongful Death and Survival Actions (Counts VI and VII)

Finally, in Counts VI and VII, Plaintiff alleged state law claims against the City of Philadelphia. (Doc. No. 1 ¶¶ 125-147.) Count VI of the Complaint alleged Survival Actions against the City under 42 Pa. C.S. § 8302, which provides:

> All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants.

42 Pa. C.S. § 8302. In Count VII, Plaintiff sets forth a wrongful death claim against the

City under 42 Pa. C.S. § 8301, which states:

> (a) General rule. -- An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.
>
> (b) Beneficiaries. -- Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.
>
> (c) Special damages. -- In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.
>
> (d) Action by personal representative. -- If no person is eligible to recover damages under subsection (b), the personal representative of the deceased may bring an action to recover damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

42 Pa. C.S. § 8301.

Arguing for dismissal of both state-law claims, the City asserts that it is immune from

liability under the Political Subdivision Tort Claims Act ("TCA"). The TCA provides

municipalities with general immunity from tort liability, as follows:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa. Const. Stat. Ann. § 8541.  Importantly, the TCA enumerates eight exceptions to immunity for local agencies.  Plaintiff claims that the City is liable under the "real property" exception to the TCA, which provides:

> (a)  Liability imposed. -- A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
>> (1)  The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense undersection 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
>>
>> (2)  The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.
>
> (b)  Acts which may impose liability. -- The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
> . . .
>
>> (3)  Real property.-- The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. As used in this paragraph, "real property" shall not include:
>>
>>> (i)  trees, traffic signs, lights and other traffic controls, street lights and streetlighting systems;
>>>
>>> (ii)  facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within rights-of-way;
>>>
>>> (iii)  streets; or
>>>
>>> (iv)  sidewalks.

See 42 Pa. C.S.A. § 8542(b)(3) (the "Real Property Exception").

In this case, the Real Property Exception does not apply to the City. Pennsylvania courts have explained that the Exception applies only if the City had total control over the premises. City of Pittsburgh v. Estate of Stahlman, 677 A.2d 384, 387 (Pa. Commw. 1996) ("Possession" within the real property exception is total control over the premises, and limited control or mere occupation of the premises for a limited period is insufficient to impose liability). Further, the City's negligent inspection or failure to inspect does not constitute "control" for the purposes of the Real Property Exception. Kline v. Pennsylvania Mines Corporation, 547 A.2d 1276, 1279 (Pa. Commw. 1988).

Here, Plaintiff admits that the property in question was owned by a private corporation, Granite Hill Properties, LLC ("Granite Hill") and a private individual, Tyrone Duren ("Duren"), who was Granite Hill's principal officer. And, as noted previously, the Complaint does not make clear whether the property was under the control of Duren and Granite Hill or the City at the time of the fire. Plaintiff alleged that Duren vacated the property and turned it over to the City as part of an agreement he made during a lawsuit against the City regarding the property. (Doc. No. 1 ¶ 132.) She later stated that after Duren turned over the property, the City neglected to lock the building to ensure that nobody occupied it. (Id. ¶ 135.) In another allegation of the Complaint, she proffered that the City failed to prevent Duren from resuming illegal use of the property as a boarding house. (Id. ¶ 138.) Thus, while the allegations allege in part that the City may have controlled the property at one time, they do not plausibly allege that the City controlled the building at the time of the fire.

It is clear, however, that the City's involvement with the building does not invoke the Real Property Exception. For one, the City never had total control over the property because it never owned it. Rather, it appears to have had control for a limited period, which is insufficient to impose

30

liability. Additionally, even during the City's seemingly limited control, Duren reassumed control of the property without authorization.

Moreover, the City had no duty to remedy the fire hazards on the premises, which Plaintiff claims contributed to Decedents' deaths. Pennsylvania courts have held that the power to inspect and regulate does not constitute sufficient control over a privately-owned building to constitute "possession" under real property exception to the TCA. Stahlman, 677 A.2d 384 at 387 (holding that the power to inspect and regulate does not constitute sufficient control over that privately-owned building to constitute "possession" under real property exception to the Act). The City also has no duty to enforce its own ordinance. Chacko v. Commonwealth, 611 A.2d 1346, 1348 (Pa. Commw. 1992) (noting that a municipality has no duty to enforce its own ordinance).

For all these reasons, the Real Property Exception does not apply to the facts of this case. Therefore, the City is immune from liability under the TCA. Defendants' Motion to Dismiss Counts VI and VII will be granted.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 9) will be granted in part and denied in part. The Motion will be granted with respect to Counts I, II, III, IV, VI and VII. The Motion will be denied with respect to Plaintiff's Equal Protection claim in Count V, and Plaintiff will be granted leave to amend the Complaint with respect to this claim. An appropriate Order follows.